IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-cv-02408-MSK-NRN

WALTER EUCKER,

    Plaintiff,

v.

SUNLAND ASPHALT & CONSTRUCTION, INC.,

    Defendant.

---

# OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** comes before the Court pursuant to Defendant Sunland Asphalt & Construction, Inc.'s ("Sunland") Motion for Summary Judgment **(# 25)**, Plaintiff Walter Eucker's response **(# 28)**, and Sunland's reply **(# 31)**.

## JURISDICTION

The Court exercises diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. Sitting in diversity, this Court applies Colorado law. *See Perlmutter v. U.S. Gypsum Co.*, 4 F.3d 864, 869 (10th Cir. 1993).

## FACTS

The Court summarizes the pertinent facts herein, elaborating as necessary in its analysis.[1]

---

[1] Unless otherwise noted, the Court derives the factual discussions herein from the Plaintiff's version of events and construes the evidence most favorably to him for purposes of this motion.

1

In 1977, Black Gold Asphalt ("Black Gold") was formed by Mr. Eucker's brother, Chuck Eucker. Black Gold provided a variety of asphalt paving and concrete services to both residential and commercial customers. **(# 25-2 at 18)**. Mr. Eucker started working for Black Gold in the 1990s, and over the years, the company's assets were sold to a buyer who eventually closed the business.

In 2010, the Eucker brothers decided to re-enter the asphalt business and became co-owners of Black Gold Construction with Mr. Eucker owning 48% of the company and Chuck Eucker owning the other 52%. **(# 25-2 at 35, # 28 at 2-3)**. By 2011, Mr. Eucker was serving as Black Gold's manager and was running the day to day operations and management of the company.

In 2016, Mr. Eucker and his brother decided to sell the business. But Mr. Eucker was not ready to retire and desired to continue working for several years. As a consequence, when Sunland purchased Black Gold in January of 2017, Mr. Eucker and Sunland entered into an Employment Agreement ("Agreement") where Mr. Eucker was hired as Sunland's Colorado Division Manager. **(# 25-2 at 63-69)**. Mr. Eucker reported to Steve Musegades who was the Regional Vice President of Sunland over Colorado. Mr. Musegades reported to Craig Weems, the President of Sunland. **(# 25-3 at 7-10)**.

Under the Agreement, Mr. Eucker was to receive a minimum base salary of $175,000 in 2017 and $160,000 in both 2018 and 2019. **(# 25-6)**. The Agreement also provided that Sunland could terminate Mr. Eucker's employment "for cause" if:

> (1) the Executive [Mr. Eucker] fails to perform his duties or engages in unethical or immoral conduct, (2) the willful breach by the Executive of any material provision of this Agreement or (3) the Executive engages in conduct that constitutes neglect or misconduct in carrying out his duties. A termination

2

> for Cause shall not take effect until the provisions of this paragraph (iii) are complied with. The Executive shall be given written Notice of Termination by the Company Board of the intention to terminate the Executive for Cause, such notice to state the particular act or acts or failure or failures to act that constitute the grounds on which the proposed termination for Cause is based. The Executive shall have ten (10) days after the date that such written notice has been given to the Executive in which to cure such conduct, to the extent such cure is possible.

**(# 25-6 at 3)**.

Mr. Eucker received a job description that set forth essential duties and responsibilities of a Sunland Division Manager including: (i) set division goals; (ii) develop annual budget; (iii) provide financial information to the accounting department; (iv) attend monthly financial and corporate Scoreboard meetings; (v) promote and enforce a culture of safety that complies with all regulations; (vi) monitor and oversee daily operations to ensure that Sunland policies, procedures, and work standards are being practiced; (vii) align the division with production and sales teams that can meet deadlines, provide quality work, increase growth and generate revenue; (viii) direct and participate in jobsite visits, customer presentations/meetings and contract negotiations with customers, vendors and suppliers; (ix) be responsible for business development to include: establishing and maintaining strong partnerships with existing customers and developing new business via networking, associations, and establishing a local community presence; (x) work with the marketing manager to create an annual marketing plan to help meet financial goals; and (xi) liase with executives, directors, and managers on the implementation of the company's strategic and operational plans. **(# 25-6)**.

Mr. Eucker understood that his superiors at Sunland wanted him to operate the Colorado Division like he "had in the past, for --- for the first season." **(# 25-2 at 69)**. In the beginning, Mr. Eucker's job duties working as a manager at Black Gold were similar to his new duties as

the Division Manager at Sunland. **(# 25-2 at 87-90)** but beginning in April or May 2017, Mr. Eucker began to spend more time in training classes, learning the new systems and procedures used by Sunland and traveling to Arizona for meetings. **(# 25-2 at 90-93)**. Over the next several months, Mr. Musegades became concerned with issues and deficiencies with Mr. Eucker's job performance, specifically that Mr. Eucker failed to complete required tasks, communicate with other Sunland employees, adequately supervise and manage his staff, and implement Sunland policies and procedures. **(# 25-3 at 22-23)**.

On July 11, 2017, Mr. Musegades met with Mr. Eucker and gave him his 6-month performance review, which included a document that detailed numerous job performance issues. **(# 25-7)**. Mr. Eucker was hesitant to sign the document, stating that it was inaccurate. He also stated that no one at Sunland had expressed any concern or dissatisfaction with his job performance, but he eventually signed the document after Mr. Musegades said he would not leave Mr. Eucker's office until it was signed. **(# 25-2 at 107-108)**.

In late August 2017, Mr. Musegades discussed Mr. Eucker's ongoing job performance deficiencies with Mr. Weems, particularly Mr. Eucker's lack of engagement, unavailability via cell phone, lack of participation in marketing campaigns, inability to understand a financial statement, and the failure to draft quarterly business plans and Scoreboard presentations for meetings. **(# 25-3 at 22-23)**. Mr. Musegades was concerned that Mr. Eucker's sole job activities seemed to be focused on "just sales and managing his own projects." **(# 25-3 at 22)**.

On September 12, 2017, Ms. McWenie (Sunland's Human Resources representative) and Mr. Musegades traveled to Denver to meet with Mr. Eucker. Mr. Musegades gave Mr. Eucker a memorandum that he had prepared which outlined Mr. Eucker's general lack of improvement

4

and job performance deficiencies following his 6-month review.  These deficiencies included a failure to (i) comply with DOT regulations; (ii) communicate with Mr. Musegades or other Sunland employees; or (iii) conduct meetings with his Colorado division employees.  **(# 25-9)**.  The last line of the memo stated that "Sunland is terminating [Mr. Eucker's] employment agreement effective immediately for cause."  **(# 25-9)**.  Mr. Eucker refused to sign the document stating that it was inaccurate, and he was escorted out of the building, placed in a car, and sent home.  He contends that he was fired "right then."  **(# 25-2 at 149-155)**.

Sunland mailed Mr. Eucker a letter dated September 12, 2017 entitled "Notice of Intent to Terminate Employment for Cause", stating that Sunland has "Cause to terminate your employment pursuant to Section 4(a)(iii), subsections (1), (2) and (3) of your Employment Agreement."  **(# 25-10)**.  Then, Sunland mailed Mr. Eucker another letter dated September 22, 2017, stating that it "determined that you did not satisfactorily cure the circumstances identified in the Notice of Intent to Terminate.  Accordingly, your employment is terminated effective immediately."  **(# 25-11)**.

Based on these facts, Mr. Eucker commenced the instant action asserting one claim of breach of employment contract against Sunland under Colorado law.  Sunland moves for summary judgment in its favor on Mr. Eucker's claim.

## **LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs

what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

6

claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## ANALYSIS

### A. Evidentiary Issues

The Court begins by addressing two evidentiary issues raised in the parties' summary judgment briefing.

The first issue concerns the admissibility of Walter Eucker's affidavit, Docket No. 28-1, which was submitted by Mr. Eucker. Sunland requests that the Court disregard the affidavit because Mr. "Eucker attempts to artificially manufacture issues of fact through the classic use of a sham affidavit which contradicts his admissions and goes into great detail into topics on which he had supposedly exhausted his knowledge during his deposition." **(# 31 at 6)**.

The standard for considering whether an affidavit should be excluded as a "sham affidavit" is set out in *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001). In *Ralston,* the 10th Circuit held that the district court did not abuse its discretion in excluding an affidavit that "directly contradicted certain positions previously taken by [the affiant] and which were detrimental to [the plaintiff's] sole remaining cause of action" because the circumstances supported a conclusion that the affidavit sought to create a "sham fact issue." *Id.* The Circuit identified three factors relevant to "whether a contradicting affidavit seeks to create a sham fact issue": (1) whether "the affiant was cross-examined during his earlier testimony"; (2) whether "the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence"; and (3) whether "the earlier testimony

7

reflects confusion which the affidavit attempts to explain." *Id.* at 973. Applying these factors, Sunland has not shown that the affidavit should be excluded.

The Court will assume that Mr. Eucker had access to the same exhibits both prior to his deposition and at the time of preparation of his affidavit. The Court will also assume that Mr. Eucker was cross-examined at his deposition. However, Mr. Eucker's affidavit does not directly contradict the portions of Mr. Eucker's deposition that Sunland submits. For example, Sunland submits the following excerpts from Mr. Eucker's deposition:

- He testified that he was told that his new role at Sunland would be "like running your own little company and you'd be running that division." **(# 24-2 at 62)**. In his affidavit, Mr. Eucker added that "[b]y this, I understood that I was to have significant discretion over how the division would be run." **(# 28-1 at 4)**.

- Mr. Eucker testified that he did not ask any questions about his new job duties prior to the sale and only recalled casual discussions about general job duties after the sale. **(# 25-2 at 62-66)**. In his affidavit, Mr. Eucker stated that at the time he started at Sunland, he did not have questions about job duties, but "[a]s time went on, I did have many questions and did ask questions." **(# 28-1 at 5)**.

- Mr. Eucker responded to a question as to why Renee McWenie was unable to get through all of the human resource materials she prepared during a meeting by saying "I think it was just the – the amount of time that it took." **(# 25-2 at 115)**. In his affidavit, he added that Ms. McWenie had arrived late to the meeting and needed time to prepare, so the meeting started later than it was scheduled and that "if she didn't cover everything that she wanted in the time she had, it was only because she had too much material to go over in the time she allowed for herself." **(# 28-1 at 6-7)**.

- Mr. Eucker testified that "part of the [Safety 7 cards] were distributed. Some of them were out in the trucks. I assigned this to Chuck Asher, who was supposed to put them in all vehicles." **(# 25-2 at 123)**. In his affidavit, Mr. Eucker added that the "incident packets and Safety 7 cards that remained in the conference room were extra copies that were there for future use." **(# 28-1 at 10)**.

None of these examples appear to contain contradictory testimony. Thus, based on this record, the Court cannot conclude that Mr. Eucker's affidavit was intended to contradict his earlier

testimony, and there is no basis for excluding the affidavit under *Ralston*. *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014) (holding that witness's affidavit did not "fit[ ] the sham affidavit paradigm" because it did not "contain any allegations that would directly contradict [the witness's] earlier deposition testimony" (internal quotation marks omitted)); *see also Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (holding that the district court abused its discretion by excluding affidavits without first identifying how they conflicted with prior deposition testimony).

The second evidentiary issue concerns Sunland's reliance on two "performance review" documents prepared by Mr. Musegades. **(# 25-7, #25-9)**. Mr. Eucker contends these documents contain inadmissible hearsay – evidence not based on Mr. Musegades personal knowledge. Although Mr. Musegades' statements as to what others may have told him are classic hearsay, Sunland contends that these documents are admissible under the business records hearsay exception set forth in Fed. R. Evid. 801(c)(6) or are statements offered for the effect on the listener.

Rule 801(c)(6) "provides an exception to the hearsay rule for business records if they are 'kept in the course of regularly conducted business activity, and if it was the regular practice of that business activity to make the . . . record.'" *United States v. Ary*, 518 F. 3d 775, 786 (10th Cir. 2008). To satisfy Rule 803(6) the proponent of the records must make a foundational showing that the records were (1) prepared in the normal course of business; (2) at or near the time of the events recorded; (3) based on the personal knowledge of the person creating the record or a person who had a business duty to transmit the information to the person who created

9

the record; and (4) that the sources, methods and circumstances by which the record was made are trustworthy. *Id.*

These performance reviews for Mr. Eucker were prepared by Mr. Musegades, and although they may have been prepared in the ordinary course of business, there is no showing as to how the information contained in the reviews was obtained or from what sources. Also, there is no showing by Mr. Musegades that he had personal knowledge as to the information included in the reviews. Further, while Ms. McWenie states that "Sunland regularly prepares performance memoranda for its employees", like the two at issue for Mr. Eucker, "in the Company's regular course of business" **(# 31-1 at 2)**, she cannot show what facts were within Mr. Musegades' personal knowledge. In order to fall under the business record exception to hearsay under Rule 803(6), the records must have been made in the ordinary course of business either by a person with personal knowledge or a person whose duty it was to transmit the knowledge to Mr. Musegades. There has been so such showing. Moreover, there has been no showing that the information contained in the reviews was obtained through a trustworthy process. Thus, the Court will consider these performance review documents as the basis upon which Sunland terminated Mr. Eucker's employment but not for the truth of the matters asserted in them.

**B. Breach of Contract Claim**

Mr. Eucker claims that Sunland breached his employment contract in that it did not have "cause" to terminate his employment. For this claim, under Colorado law, Mr. Eucker has the burden to establish: (1) the existence of an enforceable contract; (2) the plaintiff's performance of his or her obligations under the contract or some justification for nonperformance; (3) the defendant's failure to perform its obligations under the contract; and (4) the plaintiff's damages

10

flowing from the defendant's breach. *See Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted). The "performance" element in a breach of contract action means "substantial performance", which "occurs when, although the conditions of the contract have been deviated from in trifling particulars not materially detracting from the benefit the other party would derive from a literal performance, [the defendant] has received substantially the benefit he expected, and is, therefore, bound to pay." *Id.* (quotations omitted). When the claim is for breach of an employment contract, Mr. Eucker must come forward with evidence, that if true, would establish that he substantially performed his duties under the Employment Agreement or that there existed some justifiable reason for him not to do so. *Id.* If he does so, his showing is sufficient for both elements 3 and 4 -- if he performed his duties, there would be no "cause" to terminate his employment.

It is undisputed that pursuant to Paragraph 4(iii) of the Employment Agreement, Sunland may terminate Mr. Eucker's employment for "cause" if Mr. Eucker "fails to perform his duties . . . or engages in conduct that constitutes neglect . . . in carrying out his duties." **(# 25-6)**. Mr. Eucker's essential duties were set out in the Job Description of a Division Manager. **(# 25-6 at 10)**. In its motion, Sunland argues that Mr. Eucker's employment was terminated for "cause" due to his failure to perform essential job duties. From the job description, it categorizes the enumerated duties into three broad groups, then broadly contends that Mr. Eucker failed to perform in each of the three categories. Sunland contends that Mr. Eucker failed to effectively communicate, to properly delegate, and to adhere to company policy. **(# 25 at 17)**. Within each category, Sunland identifies one or more examples where it contends Mr. Eucker failed to perform his duties.

Thus[2], the only question before the Court with regard to this motion is whether Mr. Eucker has come forward with sufficient evidence, which if true, would demonstrate that he performed his duties. If so, he will have made a prima facie showing sufficient to create a triable issue of fact as to both elements 3 and 4, and a trial will be required.

**Mr. Eucker's Duties**

1. <u>Failure to Effectively Communicate</u>

Sunland contends that Mr. Eucker failed to respond to emails, telephone calls, and attend meetings. It focuses on several specific communications.

The first was on or about May 18, 2017. That day, Ms. McWenie, Sunland's HR Manager, sent Mr. Eucker an email to schedule a trip for the HR representatives to travel from Phoenix to Denver to discuss Sunland's HR policies and procedures with the new Colorado Division employees. **(# 25-7 at 5-6)**. That same day, Mr. Eucker responded to Ms. McWenie's initial email, and the visit was scheduled for June 7-8. **(# 25-7 at 5)**. Ms. McWenie then emailed an agenda that started with a meeting at 1:00 p.m. on June 7 with Mr. Eucker and two of his employees (Kendra and Tina) to discuss "job descriptions, hiring, new hire orientation, on boarding and training, payroll follow up if needed." **(# 25-7 at 5)**. The meeting was to resume the following day with Mr. Eucker and his "supervisors." **(# 25-7 at 5)**. The June 7 meeting commenced about 2:00 p.m., but Mr. Eucker had to leave at 2:30 p.m. to attend a weekly scheduling meeting that Mr. Musegades advised him could not be changed. **(# 28-1 at 6)**. Mr. Eucker, Kendra, and two other employees (Don Mance, and Todd Barrett), all attended the June

---

[2] For purposes of this motion, the parties do not ask the Court to interpret the contract or define "cause". They do not appear to dispute that the duties identified by Sunland were, in fact, Mr. Eucker's duties.

12

8 meeting, but they were unable to complete their review of all of the planned material. **(# 25-2 at 114-117, # 25-7 at 3)**. Ms. McWenie was frustrated that they were not able to complete more training and that it appeared to her that Mr. Eucker's staff was not aware of the meeting and were unprepared. **(# 25-3 at 82-83, # 25-7 at 3)**. However, Mr. Eucker contends that he did inform his staff about the meeting and that all of his requested staff members were in attendance. **(# 25-2 at 113-115, # 25-7 at 5)**. Mr. Eucker also contends that due to Ms. McWenie's late arrival on June 7, the meeting started later than the scheduled time. **(# 28-1 at 6)**.

On June 19, 2017, Ms. McWenie sent job descriptions to Mr. Eucker for his office staff to review and return with any modifications. **(# 25-7 at 3)**. Sunland contends that Mr. Eucker did not return the job descriptions by the requested deadline. **(# 25-3 at 118-120, #25-7 at 3)**. However, Mr. Eucker was not aware of a deadline to return the job descriptions, but after he was notified that they had not been returned to HR, he spoke to his staff and the job descriptions were returned the week of July 11. **(# 25-2 at 118-120, # 18-1 at 9)**.

Sunland also contends that Mr. Eucker "frequently failed to respond to emails and phone calls, and did not return voicemails." **(# 25 at 21)**. In particular, Sunland cites to two emails where Mr. Eucker failed to respond: (1) an email sent by Mr. Musegades concerning a marketing campaign and (2) and email sent by Mr. Musegades about the status of the transfer of a concrete license to Sunland. **(# 25 at 21)**. Although Mr. Eucker admits that he did not respond via email to these two emails, it is undisputed that he did respond by speaking directly to Mr. Musegades about both the marketing campaign and the status of the concrete license. **(# 25-2 at 110-112, 124-127)**.

Sunland also contends that Mr. Eucker missed meetings with vendors and Sunland's President and a job interview of a potential candidate. As to the meeting with the vendor, Mr. Eucker did attend the meeting, however, he opted to skip the follow-up lunch, which he testified was "fine" with Mr. Musegades. **(# 25-2 at 173-174, #28-1 at 12)**. As to the meeting with Mr. Weems, it was initially scheduled for a certain date, but then Mr. Weems ended up visiting the following day. Mr. Eucker was in the office that morning, but Mr. Weems was in a closed-door meeting with another employee. Mr. Eucker left to meet with a customer and returned around 2:30 p.m. and asked to speak with Mr. Weems, but was informed that Mr. Weems did not have time. **(# 25-2 at 160-162)**. As to the job interview, it was scheduled by Don Mance for the evening of September 6 at an unknown restaurant. Mr. Eucker was not notified about the interview until that day and was not able to adjust his schedule so that he could attend. **(# 25-2 at 157-159, # 28-1 at 18)**. As to the other general contentions that Mr. Eucker did not attend company meetings or was uncommunicative, other than the examples cited above, Mr. Eucker testified that he attended all required meetings and spoke with his staff on a daily basis. He also promptly returned messages left on his cell phone despite poor cell service at his home. **(# 28-1 at 16)**. On this record, the Court cannot say that Mr. Eucker failed to communicate with his superiors, co-workers, or his staff. It is undisputed that Mr. Eucker regularly communicated with his colleagues via email, telephone, or in person. While in some instances Sunland employees would have preferred more prompt responses, Mr. Eucker showed that he did respond to all communications and attended all meetings unless they were scheduled at the last minute or he was expected to attend another work-related meeting. Thus, Mr. Eucker has put forth competent

evidence to demonstrate a genuine dispute of fact with regard to whether he failed to perform the essential job duty of effectively communicating.

    2. <u>Failure to Effectively Delegate/Supervise</u>

Sunland contends that Mr. Eucker did not effectively supervise, manage, or delegate tasks to his staff in Colorado. Specifically, Sunland takes issue with Mr. Eucker's implementation of Sunland's safety policies and procedures. **(# 25-3 at 85-92)**. Sunland asserts that despite being trained that safety materials must be placed in all company vehicles and given to all of the drivers; Mr. Eucker failed to adhere to this policy. **(# 25-3 at 89-91)**. Mr. Eucker states that he immediately delegated this task – the placement of safety incident packets and cards into the company vehicles – to one of his employees who advised that it had been completed. However, Mr. Eucker did not follow up the status of this task until asked about it by Mr. Musegades. **(# 25-2 at 122-124, # 28-1 at 10)**.

Sunland also contends that Mr. Eucker allowed one of his employees to smoke near the office and not wear the required hard hat in violation of Sunland's policies. **(# 25-3 at 85-87)**. However, Mr. Eucker did confront this employee "many times about making sure he followed policy." Mr. Eucker advised him "point-blank that: You have to follow these rules or you won't be here long." **(# 25-2 at 121)**. Mr. Eucker was never told to fire this employee and chose not to fire him due to his shortage of staff. Further, these were new policies to former Black Gold employees, and Mr. Eucker wanted to afford them time to adapt and transition to Sunland's policies. **(# 25-2 at 121)**.

Sunland further states that Mr. Eucker failed to effectively delegate and or supervise when he delayed hiring a cleaning crew for the Colorado Division offices. **(# 25-3 at 107-109)**.

15

However, Mr. Eucker did delegate this task to his office staff, who did hire a cleaning crew. Although securing a cleaning crew took several weeks because Mr. Eucker's staff had to get estimates and find a cleaning crew that would work on the weekends, this task was eventually completed. **(# 25- at 135-136, # 28-1 at 11)**.

Sunland also highlights an instance where Mr. Musegades had to inform one of Mr. Eucker's employees that he was being demoted because of Mr. Eucker's inability to manage or communicate. **(# 25-3 at 104-105)**. However, Mr. Eucker's version of this event differs in that he and Mr. Musegades disagreed about cutting this particular employee's pay, and that Mr. Musegades volunteered to inform the employee of his pay cut. **(# 25-2 at 133)**. Mr. Eucker further disputes Mr. Musegades' contention that Mr. Eucker told his employees that Mr. Musegades had denied certain personnel requests. **(# 25-2 at 130-133, # 28-1 at 15)**. These directly conflicting statements create triable issues of fact. Based on this record, a reasonable jury could determine that Mr. Eucker appropriately discharged his job duties by effectively delegating tasks to his employees and supervising them.

    3. <u>Failure to Adhere to Company Policies and Procedures</u>

Sunland's contentions that Mr. Eucker failed to adhere to company policies and procedures are based on the following three examples: (i) that he failed to prepare quarterly business plans required of all division managers; (ii) that he was unable to perform financial "Scoreboard" presentations for meetings; and (iii) that he failed to ensure that his drivers complied with Federal Department of Transportation's driving hour limitations. **(# 25 at 1-15)**.

As to the quarterly business plans, Mr. Eucker testified that he was not expected to prepare these reports for the first year "because Sunland had to transition our division to its

16

computer and accounting systems." **(# 25-2 at 87-88, # 28-1 at 17)**. The Colorado division did not transition to Sunland's financial systems until July 2017, and Mr. Eucker was terminated before the third quarter report was due in October. **(# 28-1 at 17)**. As to the Scoreboard reports, Mr. Eucker stated that he was not required to complete Scoreboard reports for the first quarter of 2017 because his division did not have any significant business. **(# 28-1 at 17-18)**. After the first quarter, however, Mr. Musegades assisted Mr. Eucker in preparing the Scoreboard reports for the monthly financial meetings. **(# 25-2 at 77-78, # 28-1 at 17-18)**.

Finally, Sunland claims that Mr. Eucker allowed his employees to exceed Federal Department of Transportation regulations for the number of hours a driver could drive. Sunland cites to one instance where Mr. Eucker's son, Kolton Eucker, a Sunland employee, traveled to a jobsite in Loveland, Colorado to perform a concrete sealcoating job. **(# 25-3 at 127-129)**. The job took 18 hours to complete, which put Kolton over the limit for hours he was permitted to work pursuant to the Federal regulations. **(# 28-1 at 19)**. Mr. Eucker's daughter had a medical emergency, and Kolton Eucker drove back to Denver against the direction of Don Mance, one of the project supervisors and Mr. Eucker's employee. **(# 25-2 at 152-154, # 28-1 at 19)**. While Sunland states that Mr. Eucker was responsible for Kolton Tucker exceeding his allowed hours, Mr. Eucker testified that he expressly told Kolton to stay in Loveland and not to travel to Denver. **(# 28-1 at 19)**.

Based on this record, the Court finds triable issues of fact exist as to whether Mr. Eucker was excused from completing quarterly business plans. It is undisputed that Sunland did not transition its computer and financial systems to the Colorado Division until July 2017, after Mr. Eucker had been on the job for approximately 7 months. Then, he was fired in August. There

17

are genuine disputes of fact as to whether Mr. Eucker could have submitted a quarterly business plan after July 2017 but before his termination in August. Also, the undisputed evidence shows that Mr. Eucker did prepare Scoreboard Reports – albeit with the assistance of Mr. Musegades. Whether this amounts to nonperformance of an essential job duty is a question of fact for the jury. Finally, it is undisputed that Mr. Eucker told Kolton Eucker not to drive home from Loveland in violation of federal regulations, thus creating a genuine issue of fact as to whether Mr. Eucker permitted or encouraged his drivers to exceed governing regulations. Thus, the Court finds Mr. Eucker has made a showing that he adhered to Sunland's policies and procedures or was justified for any nonperformance of these essential job duties.

The Court finds Mr. Eucker has put forth competent evidence for a prima facie showing that he performed his duties under the Employment Agreement and that there was no good cause for his employment to be terminated. Although Sunland disagrees, the question of Mr. Eucker's performance is a question for a jury to assess. Accordingly, Sunland's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment **(# 25)** is **DENIED.** Mr. Eucker's breach of contract claim remains pending and will proceed to a trial. The parties shall jointly contact chambers within 14 days of this order to schedule the final pretrial conference.

Dated this 2nd day of March, 2020.

BY THE COURT:

_____

Marcia S. Krieger
Senior United States District Judge